*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name:  11a0033p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

RICHARD L. BAUD and MARLENE BAUD,

*Appellees,*

No. 09-2164

*v.*

KRISPEN S. CARROLL,

*Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 09-10673—Nancy G. Edmunds, District Judge.

Argued:  August 6, 2010

Decided and Filed:  February 4, 2011

Before:  COLE and CLAY, Circuit Judges; KATZ, District Judge.[*]

_____

**COUNSEL**

**ARGUED:**  Krispen S. Carroll, OFFICE OF THE CHAPTER 13 TRUSTEE, Detroit, Michigan, for Appellant.  Melissa A. Caouette, Livonia, Michigan, for Appellees. **ON BRIEF:**  Krispen S. Carroll, Maria Gotsis, OFFICE OF THE CHAPTER 13 TRUSTEE, Detroit, Michigan, for Appellant. Melissa A. Caouette, Charles J. Schneider, Livonia, Michigan, for Appellees.

_____

**OPINION**

_____

COLE, Circuit Judge.  As numerous courts and commentators have noted, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") has created many difficult problems of statutory interpretation, none more vexing than those

_____

[*]The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation.

arising from application of the "projected disposable income test" imposed by 11 U.S.C. § 1325(b)(1). Under § 1325(b)(1)(B) of the Bankruptcy Code (the "Code"), if the Chapter 13 trustee or the holder of an allowed unsecured claim objects to the confirmation of a debtor's plan that does not provide for full payment of unsecured claims, the plan may be confirmed only if it "provides that all of the debtor's projected disposable income to be received in the *applicable commitment period . . .* will be applied to make payments *to unsecured creditors* under the plan." 11 U.S.C. § 1325(b)(1)(B) (emphasis added). In addition to replacing the phrase "three-year period" formerly used in § 1325(b)(1)(B) with the term "applicable commitment period" and inserting in that subsection the phrase "to unsecured creditors" before "under the plan," BAPCPA substantially redefined the term "disposable income" and established different applicable commitment periods depending on whether the "current monthly income" (as defined in § 101(10A)) of the debtor and the debtor's spouse combined, when multiplied by 12, is above or below the median income of the relevant state. Three interpretative issues raised by these changes are presented in this appeal. First, if the trustee or the holder of an unsecured claim objects to the confirmation of a Chapter 13 plan of a debtor with positive projected disposable income who is not proposing to pay unsecured claims in full, does § 1325(b) require the plan to have a duration equal to the applicable commitment period in order to be confirmed? Second, how does the amended definition of disposable income set forth in § 1325(b)(2) affect the calculation of a debtor's "projected disposable income"? Third, if the calculation demonstrates that the debtor has zero or negative projected disposable income, does any temporal requirement imposed by § 1325(b) apply?

Krispen Carroll, Chapter 13 Trustee for the Eastern District of Michigan (the "Appellant"), contends that § 1325(b) imposes a minimum plan length and that there is no exception for debtors who have zero or negative projected disposable income. Even if there were such an exception, debtors Richard and Marlene Baud (the "Appellees") would not qualify for it, the Appellant argues, contending that they do in fact have positive projected disposable income. The Appellees counter that § 1325(b) establishes a minimum *amount* that must be paid to unsecured creditors, not a minimum *duration*

of the plan and that, even if § 1325(b) does mandate a minimum plan length, there is an exception for debtors, like them, with negative projected disposable income.

Whether § 1325(b) as amended by BAPCPA requires a Chapter 13 plan that has drawn an objection and that provides for a less than full recovery for unsecured claimants to have a duration equal to the applicable commitment period if the debtor has positive projected disposable income, whether the amended definition of disposable income signifies that courts must no longer include in the calculation of projected disposable income certain categories of income they typically included prior to BAPCPA and must permit above-median-income debtors to deduct certain expenses they might not have been able to deduct before BAPCPA, and whether any temporal requirement set forth in § 1325(b) applies to debtors with zero or negative projected disposable income, are questions that have deeply divided the courts.

Our holding today is three-fold. First, we hold that, if the trustee or the holder of an allowed unsecured claim objects to confirmation of a Chapter 13 plan of a debtor with positive projected disposable income who is not proposing to pay unsecured claims in full, the plan cannot be confirmed unless it provides that all of the debtor's projected disposable income to be received in the applicable commitment period will be applied to make payments over a duration equal to the applicable commitment period imposed by § 1325(b). Further, we hold that the calculation of a debtor's projected disposable income: (a) must not include items—such as benefits received under the Social Security Act—that are excluded from the definition of currently monthly income set forth in § 101(10A); and (b) must deduct expenses that the Code, as amended by BAPCPA, permits above-median-income debtors to deduct. Finally, we hold that there is no exception to the temporal requirement set forth in § 1325(b) for debtors with zero or negative projected disposable income. Accordingly, we **AFFIRM** in part and **REVERSE** in part the district court's opinion and order, and **REMAND** the case to the district court with instructions to remand to the bankruptcy court for further proceedings consistent with this opinion.

## I. BACKGROUND

**A.	The Statutory Framework**

Prior to BAPCPA's passage, the Code required that, if the Chapter 13 trustee or the holder of an allowed unsecured claim objected to confirmation, then the debtor's plan could be confirmed only if it (1) called for full payment of the unsecured claim(s) or (2) provided that "all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan." 11 U.S.C. § 1325(b)(1) (2000). The Code defined "disposable income" loosely as "income which is received by the debtor and which is not reasonably necessary to be expended . . . for the maintenance or support of the debtor or a dependent of the debtor, including charitable contributions . . . and . . . if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business." 11 U.S.C. § 1325(b)(2) (2000). Bankruptcy courts determined a debtor's income and reasonably necessary expenses based on the debtor's actual financial circumstances, using "the best information available at the time of confirmation," 6 Keith M. Lundin, *Chapter 13 Bankruptcy* § 494.1 (3d ed. 2000 & Supp. 2006), making adjustments to "account [for] foreseeable changes in a debtor's income or expenses." *Hamilton v. Lanning*, 130 S. Ct. 2464, 2469 (2010) (describing pre-BAPCPA practice).

BAPCPA extensively amended § 1325(b) by substituting the term "applicable commitment period" for "three-year period" in § 1325(b)(1), redefining "disposable income" in § 1325(b)(2), and adding § 1325(b)(3) and (b)(4). Subsections (b)(1) and (b)(2) now read as follows:

> **(b)(1)** If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—
>
>> **(A)** the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

**(B)** the plan provides that all of the debtor's *projected disposable income* to be received in the *applicable commitment period* beginning on the date that the first payment is due under the plan will be applied to make payments *to unsecured creditors* under the plan.

**(2)** For purposes of this subsection, the term "*disposable income*" means *current monthly income* received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less *amounts reasonably necessary to be expended*—

**(A)(i)** for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and

**(ii)** for charitable contributions . . . in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and

**(B)** if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(1)–(2) (Supp. 2010) (emphasis added). Consequently, determining whether a plan may be confirmed over objection now requires several steps. First, in order to determine the debtor's "disposable income" according to the revised definition in § 1325(b)(2) (which itself expressly excludes certain categories of income), one must calculate the debtor's "current monthly income" and the "amounts reasonably necessary to be expended" for, *inter alia*, the maintenance or support of the debtor or a dependent of the debtor.

Under 11 U.S.C. § 101(10A), the term "current monthly income" means the average gross monthly income that the debtor receives, derived during a six-month look-back period, excluding "benefits received under the Social Security Act" and certain other payments not relevant here. *See* 11 U.S.C. § 101(10A)(B). Because current monthly income is based on the debtor's past income (in most cases, income the debtor

receives that is derived during the 6-month period immediately before the bankruptcy[1]) and excludes certain payments, it will not necessarily reflect the debtor's actual income at the time of confirmation. *See* 6 Lundin, *supra*, § 468.1 (describing the calculation of current monthly income).

The appropriate method for calculating "amounts reasonably necessary to be expended" depends on whether the debtor's current monthly income is above or below the state median income. For debtors with current monthly income equal to or less than the applicable median family income, § 1325(b) is silent on how to calculate these amounts, suggesting that they are to be based (as before BAPCPA) on the debtor's reasonably necessary expenses. *See Schultz v. United States*, 529 F.3d 343, 348 (6th Cir. 2008) (noting that expenditures for below-median-income debtors are to be calculated as they were pre-BAPCPA); 6 Lundin, *supra*, **§** 466.1 ("Chapter 13 debtors with [current monthly income] less than applicable median family income remain subject to the familiar reasonable and necessary test for the deductibility of expenses in § 1325(b)(2)(A) and (B)."). For debtors with current monthly income exceeding the applicable median family income, however, § 1325(b)(3) requires courts to determine the amounts reasonably necessary to be expended in accordance with the "means test," *i.e.*, the statutory formula for determining whether a presumption of abuse arises in Chapter 7 cases. *See* 11 U.S.C. § 1325(b)(3) (Supp. 2010) (requiring that "[a]mounts reasonably necessary to be expended under paragraph (2) . . . be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if the debtor has current monthly income, when multiplied by 12, greater than [the applicable state median]"); *Ransom v. FIA Card Servs., N.A.*, 131 S. Ct. 716, 721–22 (2011) ("For a debtor whose income is above the median for his State, the means test identifies which expenses qualify as 'amounts reasonably necessary to be expended.' The test supplants

---

[1]*See* 11 U.S.C. § 101(10A)(A)(i). Sections 101(10A)(A)(ii) and 521(i)(3) of the Code also offer a Chapter 13 debtor the option of seeking leave to delay the filing of "Schedule I – Current Income of Individual Debtor(s)" ("Schedule I") and requesting that the bankruptcy court select a six-month period that is more representative of the debtor's future monthly income in calculating current monthly income. *See In re Dunford*, 408 B.R. 489, 497 (Bankr. N.D. Ill. 2009) (granting Chapter 13 debtor an extension of the time to file Schedule I and resetting the six-month period for calculation of current monthly income). Such a request must be made within 45 days after the filing of the petition. *See* 11 U.S.C. § 521(i)(3).

the pre-BAPCPA practice of calculating debtors' reasonable expenses on a case-by-case basis, which led to varying and often inconsistent determinations."); *Lanning*, 130 S. Ct. at 2470 n.2 ("The formula for above-median-income debtors is known as the 'means test' and is reflected in a schedule (Form 22C) that a Chapter 13 debtor must file."). The result of determining these expenditures in accordance with the means test is that above-median-income debtors must use several standardized expenditure figures in lieu of their own actual monthly living expenses, *see* 11 U.S.C. § 707(b)(2)(A)(ii)(I),[2] a fact recognized by the Advisory Committee on Bankruptcy Rules when it promulgated Official Form 22C. *See* Official Form 22C, Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income, lines 24–29 (Dec. 2010). The standardized figures are derived from the IRS National Standards (for allowable living expenses and out-of-pocket health care) and IRS Local Standards (for housing, utilities and transportation expenses). *See* Means Testing: Census Bureau, IRS Data and Administrative Expenses Multipliers, http://www.justice.gov/ust/eo/bapcpa/meanstesting.htm (last visited Jan. 31, 2011) (listing amounts for Local and National Standards). Above-median-income debtors also are allowed to deduct their "actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides[.]" *See* 11 U.S.C. § 707(b)(2)(A)(ii)(I); *Ransom*, 131 S. Ct. at 727 ("For the Other Necessary Expense categories . . . the debtor may deduct his actual expenses, no matter how high they are."). These Other Necessary Expenses include certain taxes, involuntary employment deductions, life insurance on the debtor, certain court-ordered payments, certain educational expenses, childcare, unreimbursed health care and telecommunications services. *See* Official Form 22C, lines 30–37. Expenditures of above-median-income debtors for other items—including health and disability insurance, contributions to the care of certain household or family members, protection against family violence, home energy costs in excess of the allowance

---

[2]*See Ransom*, 131 S. Ct. at 727 ("Although the expense amounts in the Standards apply only if the debtor incurs the relevant expense, the debtor's out-of-pocket cost may well not control the amount of the deduction. If a debtor's actual expenses exceed the amounts listed in the tables, for example, the debtor may claim an allowance only for the specified sum, rather than for his real expenditures.").

specified by IRS Local Standards, certain limited educational expenses, additional food and clothing expenses in excess of the applicable IRS National Standards and a certain amount of charitable contributions—are based on debtors' own reasonably necessary needs. *See* 11 U.S.C. § 707(b)(2)(A)(ii)(I)–(V); Official Form 22C, lines 39–45. The means test and the Official Form allow certain deductions on account of ongoing payments contractually due on secured debts and priority claims without regard to whether those payments are reasonably necessary. *See* 11 U.S.C. § 707(b)(2)(A)(iii)–(iv); Official Form 22C, lines 47–49. Because standardized expense figures are used in portions of the calculation, however, the amounts reasonably necessary to be expended by above-median-income debtors are unlikely to reflect these debtors' actual expenses. *Cf.* 6 Lundin, *supra*, § 500.1 ("The amount of disposable income determined by the formula in § 1325(b)(1) will bear no certain relationship to the debtor's actual financial ability to make payments . . . because the deductions from [current monthly income] to determine disposable income are artificial and not based on the debtor's actual financial circumstances . . . .").[3]

After calculating the amounts reasonably necessary to be expended on, among other things, the maintenance or support of the debtor, the next step in determining whether a plan may be confirmed over objection is to subtract these amounts (as well as any additional amounts excluded from disposable income by § 1325(b)(2) itself and other sections of the Code[4]) from the debtor's current monthly income in order to derive the debtor's "disposable income." *See* 11 U.S.C. § 1325(b)(1)–(2). Notably, however, § 1325(b)(1) requires that all of the debtor's "*projected* disposable income" over the applicable commitment period be applied to make payments to unsecured creditors. Determining what the term "projected" adds to § 1325(b)(2)'s definition of disposable

---

[3]In addition to Form 22C, Chapter 13 debtors are required to disclose their current and anticipated future income and actual expenses, as set out in Schedule I and "Schedule J – Current Expenditures of Individual Debtor(s)" ("Schedule J"). Schedules I and J normally will better capture debtors' current financial circumstances as of the date of filing or, if amended, as of confirmation. The schedules, however, often times will not reflect debtors' disposable income as defined under BAPCPA.

[4]*See* 11 U.S.C. § 1322(f) (excluding from disposable income amounts required to repay certain retirement loans) and § 541(b)(7) (excluding from disposable income amounts withheld or received by an employer for payment as contributions to certain plans and annuities).

income led to a split among the courts.  *See* 6 Lundin, *supra*, § 467.1 (discussing the different approaches to calculating projected disposable income).  The Supreme Court has weighed in on this question.  In *Lanning*, the Supreme Court rejected the "mechanical" approach to calculating projected disposable income, under which the debtor's average monthly disposable income figure was simply multiplied by the number of months of the applicable commitment period.  *Lanning*, 130 S. Ct. at 2473–77. Instead, the Supreme Court adopted the "forward-looking" approach, under which the debtor's projected disposable income is calculated by taking into account any "known or virtually certain changes" in the debtor's disposable income at the time of confirmation.  *Id.* at 2478.  As discussed in more detail below, in our decision in *Darrohn v. Hildebrand (In re Darrohn)*, 615 F.3d 470 (6th Cir. 2010), we applied the holding in *Lanning* to an expense—the debtors' monthly mortgage payment—that the above-median-income debtors would have been able to deduct except for the "known or virtually certain" change in the debtors' circumstances occasioned by their decision to surrender the property to the mortgagee.  *See Darrohn*, 615 F.3d at 477.

The amount of the debtor's projected disposable income also depends on the "applicable commitment period," which in turn depends on whether the current monthly income of the debtor and the debtor's spouse combined, when multiplied by 12, is above or below the state median.  Section 1325(b)(4) provides that, unless the plan provides for full payment of allowed unsecured claims over a shorter time frame, the applicable commitment period is three years for below-median-income debtors and not less than five years for above-median-income debtors:[5]

> **(4)** For purposes of this subsection, the "applicable commitment period"—

---

[5] A Chapter 13 plan may not provide for payments over a period that is longer than 5 years. *See* 11 U.S.C. § 1322(d).  Thus, although § 1325(b)(4) provides that the applicable commitment period is "not less than 5 years" for above-median-income debtors, the applicable commitment period effectively is five years for such debtors, and we will refer to the applicable commitment period for above-median-income debtors as five years.  *See In re Johnson*, 400 B.R. 639, 644 & n.5 (Bankr. N.D. Ill. 2009) ("The statute actually provides that the applicable commitment period for above-median income debtors is 'not less than five years.'  However, an applicable commitment period of more than five years is not possible under § 1322(d), which states that a plan may not provide for payments over a period longer than five years."), *aff'd*, 382 Fed. App'x 503 (7th Cir. June 21, 2010) (unpublished).

(**A**) subject to paragraph (B), shall be—

> (**i**) 3 years; or

> (**ii**) not less than 5 years, if the current monthly income of the debtor and the debtor's spouse combined, when multiplied by 12, is not less than—

>> [the applicable median income]

(**B**) may be less than 3 or 5 years, whichever is applicable under subparagraph (A), but only if the plan provides for payment in full of all allowed unsecured claims over a shorter period.

11 U.S.C. § 1325(b)(4) (Supp. 2010).

## B.     Procedural Background

On September 26, 2008 (the "Petition Date"), the Appellees filed for Chapter 13 protection with the United States Bankruptcy Court for the Eastern District of Michigan. *See Baud v. Carroll*, 415 B.R. 291, 293 (E.D. Mich. 2009). The Appellees' Form 22C, which they filed on October 13, 2008, listed current monthly income of $7,086.72 (which was above the state median for a family of two), *see id*., and monthly disposable income of negative $1,203.55. *See id*. at 303. As required, the Appellees also filed Schedule I, listing gross monthly income of $9,115.63 (including Social Security benefits for one of the Appellees and income from employment for the other), and Schedule J, listing actual monthly expenses of $4,946.41. *Id.* at 293. Subtracting payroll deductions and Schedule J expenses from gross monthly income in Schedule I, the Appellees' monthly net income was $402.32, as compared to disposable income of negative $1,203.55 on their Form 22C. *See id.*

On October 13, 2008, the Appellees submitted a Chapter 13 plan that provided for monthly payments to general unsecured creditors totaling $30,321.65 over a 36-month period, which would result in less than full payment on those unsecured claims. *Id.* at 293–94. The Appellant objected to confirmation of the proposed plan, arguing that it should be extended to 60 months to conform to the applicable commitment period for above-median-income debtors. *Id.* at 294. The bankruptcy court, following briefing and

a hearing, sustained the Appellant's objection. The Appellees then filed an amended plan providing for monthly payments to general unsecured creditors totaling $58,603.97 over a period of 60 months. The bankruptcy court issued an order confirming the amended plan over the Appellees' objection. *Id.*[6]

The Appellees then filed an appeal with the United States District Court for the Eastern District of Michigan, arguing that the bankruptcy court erred in determining that the applicable commitment period under § 1325(b) imposes a temporal rather than a monetary requirement that applies to Chapter 13 debtors with zero or negative projected disposable income. *Id.* at 295. The Appellant countered that § 1325(b) requires a minimum plan length of 60 months for the Appellees who, their assertions to the contrary notwithstanding, had positive projected disposable income, as indicated by their Schedule I and Schedule J, on the date of the confirmation of their plan. *Id.* Adopting the forward-looking approach to calculating projected disposable income that the Supreme Court has since endorsed in *Lanning*, the district court held that the applicable commitment period imposes a minimum plan length of 60 months for above-median-income debtors, but that this requirement does not apply when debtors, like the Appellees, have negative projected disposable income. *Id.* at 297–303. Accordingly, the district court reversed the bankruptcy court's order and remanded the case to allow the Appellees to modify their amended Chapter 13 plan. *Id.* at 303.

The Appellant now challenges the district court's decision.

## II. ANALYSIS

The issues presented by this appeal are questions of law that we decide *de novo*. *See Nuvell Credit Corp. v. Westfall (In re Westfall)*, 599 F.3d 498, 501 (6th Cir. 2010). We review the bankruptcy court's order directly, giving no deference to the district court. *Id.* at 500.

---

[6]Following the Eighth Circuit's decision in *Zahn v. Fink (In re Zahn)*, 526 F.3d 1140 (8th Cir. 2008), the district court concluded that debtors have standing to appeal a bankruptcy court's confirmation of their own amended plan when they have been "'directly and adversely affected pecuniarily by the order.'" 415 B.R. at 296 (quoting *Harker v. Troutman (In re Troutman Enters., Inc.)*, 286 F.3d 359, 364 (6th Cir. 2002)).

**A.     Section 1325(b) Imposes a Temporal Requirement for Debtors with Positive Projected Disposable Income.**

The question of whether § 1325(b) sets forth a temporal requirement or a monetary requirement has split the courts into several interpretive camps. The United States Court of Appeals for the Eleventh Circuit and a majority of other courts have held that, if the trustee or the holder of an allowed unsecured claim objects to confirmation of a Chapter 13 plan that provides for a less than full recovery for unsecured claimants, the plan cannot be confirmed unless its length is equal to the applicable commitment period; according to these courts, this temporal requirement applies whether the debtor has positive, zero or negative projected disposable income. *See, e.g.*, *Whaley v. Tennyson (In re Tennyson)*, 611 F.3d 873, 877–78 (11th Cir. 2010); *In re King*, No. 10-18139, 2010 WL 4363173, at *2 (Bankr. D. Colo. Oct. 27, 2010); *Baxter v. Turner (In re Turner)*, 425 B.R. 918, 920–21 (Bankr. S.D. Ga. 2010); *In re Moose*, 419 B.R. 632, 635–36 (Bankr. E.D. Va. 2009); *In re Meadows*, 410 B.R. 242, 245–47 (Bankr. N.D. Tex. 2009); *In re Brown*, 396 B.R. 551, 554–55 (Bankr. D. Colo. 2008); *In re Lanning*, Nos. 06-41037, 06-41260, 2007 WL 1451999, at *7–8 (Bankr. D. Kan. May 15, 2007), *aff'd*, 380 B.R. 17 (B.A.P. 10th Cir. 2007), *aff'd*, 545 F.3d 1269 (10th Cir. 2008), *aff'd*, 130 S. Ct. 2464 (2010); *In re Kidd*, 374 B.R. 277, 280 (Bankr. D. Kan. 2007); *In re Nance*, 371 B.R. 358, 369–70 (Bankr. S.D. Ill. 2007); *In re Beckerle*, 367 B.R. 718, 719–21 (Bankr. D. Kan. 2007); *In re Pohl,* No. 06-41236, 2007 WL 1452019, at *3 (Bankr. D. Kan. May 15, 2007); *In re Strickland*, No. 06-81060C-13D, 2007 WL 499623, at *1–*2 (Bankr. M.D.N.C. Feb. 13, 2007); *In re Casey*, 356 B.R. 519, 527–28 (Bankr. E.D. Wash. 2006); *In re Davis*, 348 B.R. 449, 456–58 (Bankr. E.D. Mich. 2006). The United States Court of Appeals for the Eighth Circuit and other courts have held that, if the trustee or the holder of an allowed unsecured claim objects to the confirmation of a Chapter 13 plan of a debtor with positive projected disposable income whose plan provides for a less than full recovery for unsecured claimants, the plan cannot be confirmed unless its length is equal to the applicable commitment period; these courts, however, have declined to decide whether this temporal requirement applies when the debtor has zero or negative projected disposable income. *See Coop v.*

*Frederickson (In re Frederickson)*, 545 F.3d 652, 660 & n.6 (8th Cir. 2008), *cert. denied*, 129 S. Ct. 1630 (2009); *In re Wirth*, 431 B.R. 209, 213 (Bankr. W.D. Wis. 2010); *In re Slusher*, 359 B.R. 290, 300 n.17 (Bankr. D. Nev. 2007). The United States Court of Appeals for the Ninth Circuit as well as other courts have held that § 1325(b), although not establishing a minimum plan duration, does require a debtor with positive projected disposable income facing a plan objection and whose plan provides for a less than full recovery for unsecured claimants to pay unsecured creditors for the duration of the applicable commitment period, but that this temporal requirement does not apply if the debtor has zero or negative projected disposable income. *See, e.g.*, *Maney v. Kagenveama (In re Kagenveama)*, 541 F.3d 868, 875–77 (9th Cir. 2008); *Musselman v. eCast Settlement Corp.*, 394 B.R. 801, 814 (E.D.N.C. 2008); *In re Green*, 378 B.R. 30, 38 (Bankr. N.D.N.Y. 2007); *In re Lawson*, 361 B.R. 215, 220 (Bankr. D. Utah 2007); *In re Alexander*, 344 B.R. 742, 751 (Bankr. E.D.N.C. 2006). Finally, a significant minority of lower courts have followed the "monetary" approach, holding that § 1325(b) does not require the debtor to propose a plan that lasts for the entire length of the applicable commitment period; rather, as long as the plan provides for the payment of the monetary amount of disposable income projected to be received over that period, the court may confirm a plan that lasts for a shorter time.[7] *See, e.g.*, *In re Burrell*, No. 08-71716, 2009 WL 1851104, at *3–*5 (Bankr. C.D. Ill. June 29, 2009); *Dehart v. Lopatka (In re Lopatka)*, 400 B.R. 433, 436–40 (Bankr. M.D. Pa. 2009); *In re Williams*, 394 B.R. 550, 566–570 (Bankr. D. Colo. 2008); *In re McGillis*, 370 B.R. 720, 734–39 (Bankr. W.D. Mich. 2007); *In re Mathis*, 367 B.R. 629, 632–36 (Bankr. N.D. Ill. 2007); *In re Swan*, 368 B.R. 12, 24–27 (Bankr. N.D. Cal. 2007); *In re Brady*, 361 B.R. 765, 776–77 (Bankr. D.N.J. 2007); *In re Fuger*, 347 B.R. 94, 97–101 (Bankr. D. Utah 2006).

This question also has divided the commentators. Although it does not address the issue directly, Collier's authoritative bankruptcy treatise appears to assume a

---

[7]This approach also is known as the "multiplier" or "multiplicand" approach. It should not be confused with the mechanical approach to the calculation of projected disposable income, which the Supreme Court rejected in *Lanning* in favor of the forward-looking approach, allowing consideration of "known or virtually certain changes" to debtors' projected disposable income. *See Lanning*, 130 S. Ct. at 2478.

temporal requirement. *See* 8 *Collier on Bankruptcy* ¶ 1325.08[4][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010). By contrast, in the leading treatise on Chapter 13, Judge Lundin supports the monetary approach. *See* 6 Lundin, *supra*, § 500.1 ("The applicable commitment period does not require that the debtor actually make payments for any particular period of time. Rather, it is the multiplier in a formula that determines the *amount* of disposable income that must be paid to unsecured creditors.").

Although tenable arguments support each approach, today we join the Eighth, Ninth and Eleventh Circuits in holding that, if the trustee or the holder of an allowed unsecured claim objects to confirmation of a Chapter 13 plan of a debtor with positive projected disposable income whose plan provides for a less than full recovery for unsecured claimants, the plan cannot be confirmed unless it provides that all of the debtor's projected disposable income to be received in the applicable commitment period will be applied to make payments over a duration equal to the applicable commitment period set forth in § 1325(b).[8] Our analysis of the meaning of § 1325(b) begins "'where all such inquiries must begin: with the language of the statute itself.'" *Palmer v. United States (In re Palmer)*, 219 F.3d 580, 583 (6th Cir. 2000) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)). In this regard, certain courts adopting the temporal approach have relied, at least in part, on the temporal connotation of the term "applicable commitment period." As the Eleventh Circuit recently stated:

> [W]e first look at the term "applicable commitment period" and note that "applicable" and "commitment" are modifiers of the noun, the core substance of the term, "period." The plain meaning of "period" denotes a period of time or duration. "Applicable commitment period" at its simplest is a term that relates to a certain duration, and based on its presence in § 1325, it is a duration relevant to Chapter 13 bankruptcy. The modifier "commitment" then reveals that "applicable commitment period" is a duration to which the debtor is obligated to serve [if the debtor chooses to remain in Chapter 13]. Finally the meaning of "applicable" reflects the fact that there are alternate "commitment periods" depending on the debtor's classification as an above median income debtor or a below median income debtor.

---

[8]In Section II.C. we explain why we part with *Kagenveama* and agree with *Tennyson* in holding that this requirement applies to debtors with zero or negative projected disposable income.

*Tennyson*, 611 F.3d at 877 (citations omitted). Certain bankruptcy courts have followed this line of reasoning as well. *See Turner*, 425 B.R. at 920–21; *Brown*, 396 B.R. at 554–56; *In re Schanuth*, 342 B.R. 601, 607–08 (Bankr. W.D. Mo. 2006); *Lanning*, 2007 WL 1451999, at *7–8. The Ninth Circuit has found this rationale persuasive to the extent that the debtor has positive projected disposable income. *See Kagenveama*, 541 F.3d at 876 ("The plain meaning of the word 'period' indicates a period of time.").

Although persuasive, the evident temporal connotation of the term "applicable commitment period" is not dispositive in and of itself. Indeed, adherents of the monetary approach generally concede that applicable commitment period has a temporal connotation, but conclude that the time period it establishes is simply one part of § 1325(b)(1)(B)'s calculation of the amount of the debtor's projected disposable income that must be devoted to unsecured creditors in order for a plan to be confirmed. Thus, proponents of the monetary approach contend that, although § 1325(b)(1)(B) requires that all of the debtor's projected disposable income to be received over the course of the applicable commitment period be paid to unsecured creditors, the section does not mandate that these payments be made over any particular period of time or that the plan last for any particular duration. *See, e.g.*, *Mathis*, 367 B.R. at 633 ("[Section 1325(b)(1)(B)] does not say that 36 or 60 plan payments must be made, or that the plan must remain open for any particular duration of time. If Congress wanted to require a debtor to make 36 or 60 plan payments over three or [five] years, it would have said so."); 6 Lundin, *supra*, § 493.1 ("The disposable income test, as modified by BAPCPA, does not require that the plan last any particular period of time."). Reading § 1325(b)(1) in isolation, we might find the monetary approach to be the more plausible interpretation of the statute. As explained below, however, we conclude that the reasoning employed in *Lanning*—in which the Supreme Court relied both on the lack of explicit multiplier language in § 1325(b)(1) and on pre-BAPCPA practice—compels us to adopt the temporal approach. We also find that the reasoning employed in *Ransom*—in which the Supreme Court relied on BAPCPA's purpose of ensuring that debtors "repay creditors the maximum they can afford," *Ransom*, 131 S. Ct. at 725 (internal quotation marks omitted)—leads to the same conclusion.

1.      *The Lack of Explicit Multiplier Language or Other Indication that Congress Intended Simple Multiplication*

In *Lanning*, the Supreme Court rejected the mechanical approach to calculating projected disposable income and, in so doing, stated that "we need look no further than the Bankruptcy Code to see that when Congress wishes to mandate simple multiplication, it does so unambiguously—most commonly by using the term 'multiplied.'" *Lanning*, 130 S. Ct. at 2472. Similarly, one strong indicator that § 1325(b) should be interpreted as establishing a temporal requirement is that, if Congress had intended the applicable commitment period simply to act as a multiplier in a calculation determining the amount of money that must be paid to unsecured creditors, it would have said so explicitly. For example, § 1325(b) itself establishes a debtor's applicable commitment period based on the current monthly income of the debtor and the debtor's spouse combined "when multiplied by 12[.]" 11 U.S.C. § 1325(b)(4). Other Code provisions illustrating that Congress has been explicit when requiring simple multiplication include § 707(b)(2) (presuming abuse if current monthly income "multiplied by 60" and reduced by permitted expenses is not less than a certain amount) and § 1322(d)(1) & (2) (establishing maximum plan lengths based on the current monthly income of the debtor and the debtor's spouse combined "multiplied by 12"). It could be argued that, had Congress intended to impose maximum plan lengths as well as a minimum time for the payments of projected disposable income in response to an objection, addressing the two requirements in separate statutory sections—§§ 1322(d) and 1325(b)—was an inelegant way to accomplish this goal. Inelegant drafting, however, does not provide a sufficient reason to reject an otherwise correct interpretation of the Code. *See Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) (accepting an interpretation of a Code provision even though "[t]he statute is awkward"). Moreover, neither § 1322(d) nor § 1325(b) is superfluous under the temporal approach. *See, e.g.*, *Tennyson*, 611 F.3d at 878; *Kagenveama*, 541 F.3d at 879 (Bea, J., concurring in part and dissenting in part) (concluding that the "applicable commitment period is congruous, rather than superfluous, to § 1322(d)"). The provisions are not superfluous because they address different concerns. Section 1322(d)

establishes maximum plan lengths out of a concern for keeping debtors in Chapter 13 an unduly long time (of up to ten years).[9] By contrast, § 1325(b) establishes the minimum time (upon the filing of an objection) for the payment of projected disposable income and does so, as discussed further below, out of a concern for maximizing creditor recoveries.

Contrasting § 1325(b) with § 1129(a)(15) is also informative. Under § 1129(a)(15), if the holder of an allowed unsecured claim that is not proposed to be paid in full objects to confirmation of a Chapter 11 plan of an individual debtor, the plan can be confirmed, if at all, only if the value of the property to be distributed is not "less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer." 11 U.S.C. § 1129(a)(15). In this provision Congress made clear that a Chapter 11 plan of any length may be confirmed as long as the value of the property to be distributed is not less than the projected disposable income of the debtor to be received over five years (or the length of the plan, whichever is longer). *See* Randolph J. Haines, *Chapter 11 May Resolve Some Chapter 13 Issues*, 2007 No. 8 Norton Bankr. L. Adviser 1, 1 (Aug. 2007) ("[Chapter 11] provides that if creditors are not paid in full and someone objects, then the plan must distribute at least the amount of the annualized disposable income to be received in five years or during the term of the plan, whichever is longer. This process yields a dollar amount, and nothing else. . . . All of § 1129(a)(15) is only about the value of the property to be distributed under the plan, and this is entirely consistent with pre-BAPCPA Chapter 11 practice, which never imposed a minimum plan duration."). Judge Haines suggests that this supports a monetary approach to § 1325(b), questioning why Congress would "make Chapter 13 more difficult than Chapter 11, by imposing a minimum plan term that is longer than would

---

[9]*See In re Mandarino*, 312 B.R. 214, 216 n.3 (Bankr. E.D.N.Y. 2002) ("The rationale underlying section 1322(d), expressed in the House Judiciary Committee Report and discussed in 8 Collier on Bankruptcy, ¶ 1322.17[1], 15th Edition Revised (Matthew Bender 2002) is: 'Extensions on plans . . . and newly incurred debts put some debtors under court supervised repayment plans for seven to ten years. This has become the closest thing there is to involuntary servitude . . .'").

be required of the same debtor in a Chapter 11[.]" *Id.* But contrasting the statutory language of §§ 1325(b) and 1129(a)(15) seems to support, rather than undercut, the temporal approach. For if Congress had desired the same result in Chapter 13 as it did in Chapter 11, it presumably would have used the same construction in § 1325(b) that it used in § 1129(a)(15). All in all, we conclude that the lack of explicit multiplier language in §1325(b)—or some other clear indication that mere multiplication was intended, as in § 1129(a)(15)—strongly supports the temporal approach.

### 2. *Pre-BAPCPA Practice*

In *Lanning*, the Supreme Court also looked to pre-BAPCPA practice, concluding that such practice "is telling because we 'will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure.'" *Lanning*, 130 S. Ct. at 2473 (quoting *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Electric Co.*, 549 U.S. 443, 454 (2007)). Likewise, pre-BAPCPA practice in the context of plan confirmation counsels in favor of the temporal approach.

To understand why this is so, a brief history is in order. There was a time when the Code imposed no disposable-income requirement on a debtor facing an objection to plan confirmation. At that time, bankruptcy courts would, despite an objection, sometimes confirm plans of less than three years. *See In re Markman*, 5 B.R. 196 (Bankr. E.D.N.Y. 1980). *Cf. In re Ali*, 33 B.R. 890, 895–97 (Bankr. D. Kan. 1983) (holding, in the context of examining the good-faith requirement under § 1325(a)(3), that a Chapter 13 plan proposing to pay zero percent to unsecured creditors over 25 months would be confirmed only if it were extended to 36 months). In *Markman*, after the debtor proposed an 18-month Chapter 13 plan that would not have resulted in full payment of creditors, the Chapter 13 trustee objected to confirmation, contending that the Code required the debtor to commit to make payments over a three-year period. The bankruptcy court confirmed the plan over the trustee's objection, concluding that "[c]reditors are not prejudiced when, as in the present case, they are paid more under the Chapter 13 plan than they would receive under a Chapter 7 liquidation." *Markman*, 5 B.R. at 198 n.3. This, however, was before the Bankruptcy Amendments and Federal

Judgeship Act of 1984 ("BAFJA") became effective. With BAFJA, Congress introduced the disposable-income requirement to the Code. Courts presented with a disposable-income objection to confirmation after the enactment of BAFJA distinguished *Markman* and declined to confirm plans of less than three years. *See In re Turpen*, 218 B.R. 908, 916 (Bankr. N.D. Iowa 1998) ("Debtors provide [*Markman*] as support for their proposal to make payments of a fixed amount over less than three years. *Markman* does not aid debtors because it was decided before the disposable income requirement was added to Chapter 13 in 1984."); *In re Schwarz*, 85 B.R. 829, 830–31 (Bankr. S.D. Iowa 1988) (stating in a Chapter 12 case that "[t]he language in section 1225(b) closely parallels the language in section 1325(b)" and concluding that "the cases upon which the debtors rely [including *Markman*] no longer are apposite to the issue at hand because they were rendered prior to the enactment of the disposable income provision of section 1325(b)."). *See also In re Greer*, 60 B.R. 547, 555 (Bankr. C.D. Cal. 1986) ("If the proposed plan is less than 36 months, it must be extended to 36 months upon objection of a creditor or the Chapter 13 Trustee."); *In re Wobig*, 73 B.R. 292, 296 (Bankr. D. Neb. 1987) ("[T]he [Chapter 12] plan must be changed to provide that the plan will remain open for three years. . . .").

Several courts adopting the temporal approach have pointed out that pre-BAPCPA practice is consistent with that approach. *See Fridley v. Forsythe (In re Fridley)*, 380 B.R. 538, 544 (B.A.P. 9th Cir. 2007) ("Before BAPCPA, the §1325(b)(1) 'three-year period' operated as a temporal requirement. After BAPCPA, the § 1325(b)(1) 'applicable commitment period' continues to operate as a temporal requirement. Nothing in the statutory structure suggests that Congress meant to alter this aspect of the statute.") (citations omitted); *King*, 2010 WL 4363173, at *3 ("The Court also looks to past bankruptcy practice. Before [BAPCPA] . . . . [c]ourts construed [§ 1325(b)(1)(B)] as a temporal minimum, at least at the time of confirmation, when an objection was filed." citations and internal quotation marks omitted)); *In re King*, 439 B.R. 129, 135 (Bankr. S.D. Ill. 2010); *Schanuth*, 342 B.R. at 608 ("Under pre-BAPCPA practice, in the face of an objection to confirmation by an unsecured creditor or the trustee, § 1325(b)(1) required a debtor to devote all of the debtor's disposable income

to the plan for a minimum of three years. . . . BAPCPA's revision of § 1325, albeit significant, has not changed this tenet of pre-BAPCPA practice."). By contrast, as courts adopting the temporal approach also have noted, the monetary approach is inconsistent with post-BAFJA, pre-BAPCPA practice. *See Pohl,* 2007 WL 1452019, at *3 (holding that the monetary approach "is a significant departure from the pre-BAPCPA practice requiring a minimum period of payments that is simply not justified by the language or structure of the statute, or by the admittedly scant legislative history"[10]); *Strickland,* 2007 WL 499623, at *2; *Lanning,* 2007 WL 1451999, at *8; *Davis,* 348 B.R. at 457. *See also* 3 Lundin, *supra,* § 199.1 ("A plan shorter than 36 months will likely face an objection to confirmation unless the plan proposes to pay all claim holders in full." (citing pre-BAPCPA version of § 1325(b)(1)(A))). Post-BAPCPA decisions adopting the monetary approach in which the courts point to pre-BAPCPA practice in support of their position rely on cases decided in the context of plan modification or early-payoff, not confirmation. *See Fuger,* 347 B.R. at 97–101; *Swan,* 368 B.R. at 25. By contrast, as discussed above, pre-BAPCPA decisions addressing plan confirmation support the temporal approach.

Before leaving the issue of pre-BAPCPA practice, it bears noting that, prior to BAPCPA, § 1325(b)(1)(B) required that all of the debtor's projected disposable income to be received in the specified three-year period be applied to make payments "under the plan." Section 1325(b)(1)(B) now requires that all of the debtor's projected disposable income to be received in the applicable commitment period be applied to make payments "*to unsecured creditors* under the plan." 11 U.S.C. § 1325(b)(1)(B) (emphasis added). The addition of the phrase "to unsecured creditors" may raise certain issues that we need not reach today. *See, e.g., In re Johnson,* 408 B.R. 811, 817 (Bankr. W.D. Mo. 2009) (denying confirmation of a Chapter 13 plan that provided for projected disposable income to be paid to priority unsecured creditors, which the court held were not "unsecured creditors" within the meaning of § 1325(b)). Whatever its effect, however,

_____

[10]"[S]cant legislative history" is a reference to H.R. Rep. 109-31(I), p. 79, 2005 U.S.C.C.A.N. 88, 146. In adopting the temporal approach, some courts have relied in part on this House Report, which has a section heading entitled "Chapter 13 Plans to Have 5-Year Duration in Certain Cases." *See, e.g., Tennyson,* 611 F.3d at 879.

we do not believe that the addition of the phrase "to unsecured creditors" evinces a clear indication that Congress intended bankruptcy courts to depart from their pre-BAPCPA practice of declining to confirm plans of less than the required length if there was an objection to confirmation.

### 3. *BAPCPA's Purpose*

The facts of *Ransom* presented the issue of whether a debtor who owns a vehicle but does not have any ongoing loan or lease payments to make on the vehicle may take an ownership deduction for that vehicle when calculating projected disposable income. In holding that such a debtor may not take the deduction, the Supreme Court stated that "the text, context, and *purpose* of the statutory provision at issue" precludes the debtor from taking the deduction. *Ransom*, 131 S. Ct. at 721 (emphasis added). Regarding the purpose of the statutory provision, the Supreme Court stated:

> Congress enacted [BAPCPA] to correct perceived abuses of the bankruptcy system. In particular, Congress adopted the means test . . . to help ensure that debtors who *can* pay creditors *do* pay them.
>
> . . . .
>
> . . . [C]onsideration of BAPCPA's purpose strengthens our reading of the [statute]. Congress designed the means test to measure debtors' disposable income and, in that way, to ensure that [they] repay creditors the maximum they can afford. This purpose is best achieved by interpreting the means test, consistent with the statutory text, to reflect a debtor's ability to afford repayment. *Cf.* [*Lanning*, 130 S. Ct. at 2475-2476] (rejecting an interpretation of the Bankruptcy Code that "would produce [the] senseless resul[t]" of "deny[ing] creditors payments that the debtor could easily make").
>
> . . . .
>
> . . . Ransom's interpretation would run counter to the statute's overall purpose of ensuring that debtors repay creditors to the extent they can[.]
>
> . . . .
>
> Ransom . . . contends that his view of the means test is necessary to avoid senseless results not intended by Congress. At the outset, we note that the policy concerns Ransom emphasizes pale beside one his reading creates: His interpretation, as we have explained, would frustrate

BAPCPA's core purpose of ensuring that debtors devote their full disposable income to repaying creditors.

*Id.* at 721, 725, 727, 729 (citations and internal quotation marks omitted).

In *Ransom*, therefore, the Supreme Court chose the interpretation of the statutory provision at issue that was at least as "consistent with the statutory text," *id.* at *6, as the competing interpretation, but that also would serve "BAPCPA's core purpose of ensuring that debtors devote their full disposable income to repaying creditors." *Id.* at *10. Likewise, in adopting the temporal approach here, we are choosing the interpretation of the statutory provision at issue that is at least as consistent with the statutory text as the competing interpretation; as explained above, we also are choosing the interpretation that is consistent with pre-BAPCPA practice—from which we see no clear indication that Congress intended bankruptcy courts to depart. As explained further below in connection with our determination that the applicable commitment period applies to debtors with zero or negative projected disposable income, we also believe that our interpretation better serves BAPCPA's core purpose, recognized by the Supreme Court in *Ransom*, of ensuring that debtors devote their full disposable income to repaying creditors. And applying the applicable commitment period as a temporal requirement avoids the "senseless result[] that we do not think Congress intended" of "deny[ing] creditors payments that the debtor could easily make" if additional disposable income were to become available after confirmation. *Lanning*, 130 S. Ct. at 2475–76. Moreover, our holding in no way implicates the Supreme Court's statement in *Lanning* that it was rejecting an interpretation of the Code that in certain instances would "deny the protection of Chapter 13 to debtors who meet the chapter's main eligibility requirements." *Id.* at 2476. At most, courts that reject the temporal approach contend that it would delay Chapter 13 debtors receipt of the discharge in certain instances. *See, e.g., Swan*, 368 B.R. at 24 ("[T]he absurdity [of the temporal approach] is having a debtor remain in chapter 13 awaiting discharge where, after a certain point, he has fulfilled all of the Code requirements and his plan payment is reduced to zero."). No court or commentator of which we are aware, however, has argued that the temporal

approach would ultimately deny any debtor a discharge or any other protection afforded by Chapter 13.

The arguments set forth above provide compelling support for the temporal approach. In sum, therefore, we hold that, if the trustee or the holder of an allowed unsecured claim objects to confirmation of a Chapter 13 plan of a debtor with positive projected disposable income whose plan provides for a less than full recovery for unsecured claimants, the plan cannot be confirmed unless it provides that all of the debtor's projected disposable income to be received in the applicable commitment period will be applied to make payments over a duration equal to the applicable commitment period set forth in § 1325(b). This holding is consistent with the better reading of the text of § 1325(b), with pre-BAPCA practice and with the core purpose of BAPCPA. Our holding also is consistent with the decisions of each of the federal appellate courts to have considered this issue. *See Tennyson*, 611 F.3d at 877–78; *Frederickson*, 545 F.3d at 660; *Kagenveama*, 541 F.3d at 875–77.

**B.      The Appellees' Projected Disposable Income as of the Date of Confirmation.**

Whether the Appellees had zero, negative or positive projected disposable income as of the date of confirmation of their Chapter 13 plan turns on our answer to two questions: (1) whether benefits received under the Social Security Act can be included in the calculation of projected disposable income and (2) whether above-median-income debtors can be precluded from deducting their full mortgage payment as part of the calculation. According to the Appellant, the Appellees' Form 22C, which lists a disposable income figure of negative $1,203.55, underestimates the actual income available to fund the Appellees' plan in three ways. The Appellant points out that Form 22C (1) does not include the Appellees' Social Security benefits ($1,758 per month); (2) allows for standardized deductions for living expenses, healthcare, and transportation, even if the Appellees did not incur these costs; and (3) permits the Appellees to deduct their entire monthly mortgage payment of $1,699.93, even though this exceeds the IRS Local Standard of $791. The Appellant also argues that Form 22C does not reflect that the Appellees earned almost $300 more in monthly wages on the

Petition Date than in the six months before the month of the Petition Date, nor that they would complete their monthly 401(k) loan repayments of approximately $480 seven months after confirmation. Relying on the Supreme Court's decision in *Lanning* and our decision in *Darrohn*, the Appellant concludes that all of this additional income should be included in the calculation of projected disposable income. The parties, however, agree that the determination of whether the Appellees had zero, negative or positive projected disposable income as of the confirmation date turns primarily on the issue of whether benefits received under the Social Security Act can be included in the calculation. Given the numbers, it also matters whether the Appellees are permitted to deduct their entire monthly mortgage payment. We will consider the question presented by the benefits under the Social Security Act first and then turn to the Appellees' mortgage payment.

We conclude that benefits received under the Social Security Act—such as the benefits the Appellees receive—should not be included in the calculation of projected disposable income.[11] As previously noted, in *Lanning* the Supreme Court rejected the mechanical approach to calculating projected disposable income, under which the debtor's monthly disposable income figure simply is multiplied by the number of months comprising the applicable commitment period. *See Lanning*, 130 S. Ct. at 2473–77. Noting that in most cases "nothing more is required" in calculating projected disposable income than projecting the disposable income figure from Form 22C over the term of the plan, the Supreme Court held that "in unusual cases . . . a court may go further and take into account other known or virtually certain information about the debtor's future income or expenses." *Id.* at 2475. Thus, the Supreme Court held that the bankruptcy court could take into account the fact that the disposable-income figure on Lanning's Form 22C was inflated greatly by a one-time buyout from her former employer. *Id.* at 2470. In *Darrohn*, we considered *Lanning*'s application to a situation in which changes

[11]The benefits the Appellees are receiving are not on account of unemployment compensation. Thus, we do not decide the question—which also has split the courts—of whether unemployment-compensation benefits are "benefits received under the Social Security Act" within the meaning of § 101(10A)(B). *See Washington v. Reding (In re Washington)*, 438 B.R. 348, 350 (M.D. Ala. 2010) (collecting cases on both sides of the issue).

in the debtors' financial circumstances led to Form 22C's understating their income and overstating their expenditures. During the six months prior to filing, David Darrohn had been unemployed for ninety days, but subsequently secured another job, leading to a historical income-figure on Form 22C that was substantially lower than the income figure on the Schedule I; in addition, the Form 22C expenditure figure included mortgage payments on two properties, notwithstanding the Darrohns' undisputed intent to surrender both properties in their Chapter 13 plan. *See Darrohn*, 615 F.3d at 476. We held that these changes fell squarely within *Lanning*'s holding. Because the changes to the debtors' income and mortgage payment were both "known or virtually certain" at the time of confirmation, the bankruptcy court had the authority to take them into account when calculating the debtors' projected disposable income. *Id.* at 477. Neither *Lanning* nor *Darrohn*, however, supports the view that a court may disregard the Code's definition of disposable income (which incorporates the income exclusions of §101(10A)) simply because there is a disparity between the amount calculated using that definition and the debtor's actual available income as set forth on Schedule I. In other words, the discretion *Lanning* affords does not permit bankruptcy courts to alter BAPCPA's formula for calculating disposable income (*i.e.*, does not permit the court to alter the items to be included in and excluded from income). Permitting the bankruptcy court—as the Appellant would have us do—to include Social Security benefits in the calculation of the Appellees' projected disposable income essentially would read out of the Code BAPCPA's revisions to the definition of disposable income. Courts so held prior to the Supreme Court's decision in *Lanning. See Kibbe v. Sumski (In re Kibbe)*, 361 B.R. 302, 311–12 (B.A.P. 1st Cir. 2007) ("[I]n its adherence to Schedule I, the bankruptcy court abandoned the new definition for 'disposable income.' But Congress apparently intended to exclude certain categories of income when it defined 'disposable income' generally and then in the chapter 13 context. Not to be included in the income determination under chapter 13 are . . . benefits received under the Social Security Act . . . ."); *In re Bartelini*, 434 B.R. 285, 295–96 (Bankr. N.D.N.Y. 2010) (same); *Lanning*, 2007 WL 1451999, at *5 n.21 (same); *In re Barfknecht*, 378 B.R. 154, 161–62 (Bankr. W.D. Tex. 2007) (same); *In re McCarty*, 376 B.R. 819, 825 (Bankr. N.D. Ohio 2007)

(same); *In re Upton*, 363 B.R. 528, 534–35 (Bankr. S.D. Ohio 2007) (same); *Schanuth*, 342 B.R. at 605 (same); *see also Baud*, 415 B.R. at 302 ("In this case, the difference between Schedules I and J and the Form 22C calculation could be attributable to the fact that current monthly income under the new definition excludes Debtors' social security income[.]").[12]  And nothing in *Lanning* suggests that bankruptcy courts may ignore the statutory definition of disposable income in this manner.  *See* 8 *Collier on Bankruptcy* ¶ 1325.08[4][a] ("There is no suggestion [in *Lanning*] that a bankruptcy court may rely on the term 'projected' to otherwise deviate from the formula—for example, by including income that the formula excludes, such as Social Security benefits, or altering expense allowances permitted by the formula.").  Thus, post-*Lanning*, courts have continued to exclude from the calculation of projected disposable income the items excluded by § 101(10A).  *See In re Johnson*, 382 Fed. App'x 503, 506 (7th Cir. June 21, 2010) (unpublished) (affirming, post-*Lanning*, the bankruptcy court's "'harmonizing' approach" to the projected disposable income calculation, which "employ[s] the inclusions and exclusions from 'current monthly income' set forth in section 101(10A), but appl[ies] them not in the retrospective manner specified by that provision but rather in the forward-looking manner envisioned by section 1325(b)"); *In re Welsh*, 440 B.R. 836, 851 (Bankr. D. Mont. 2010) ("Current monthly income defined under BAPCPA, § 101(10A)(B), excludes benefits received under the Social Security Act; Section 101(10A)(B) is a clear indication that Congress intended a departure from pre-BAPCPA practice and [to] exclude SSI income from the disposable income calculation.").  *But see In re Cranmer*, 433 B.R. 391, 399 (Bankr. D. Utah 2010) (holding that a case where the debtor has Social Security benefits is the "'unusual' case the Supreme Court meant in [*Lanning*] where there are other known sources of income that should be included in the calculation of [projected disposable income]").[13]

---

[12]*Contra In re Timothy*, No. 08-28332, 2009 WL 1349741, at *6 (Bankr. D. Utah May 12, 2009) (holding that Social Security benefits can be included in the calculation of projected disposable income), *aff'd*, Nos. UT-10-003, 08-28332, 2010 WL 5383897, at *6 (B.A.P. 10th Cir. Dec. 29, 2010).

[13]Courts are split on the issue of whether a bankruptcy court may consider an above-median-income debtor's decision to not commit available Social Security benefits to unsecured creditors in the good-faith analysis under 11 U.S.C. § 1325(a)(3). *Cf. Fink v. Thompson (In re Thompson)*, 439 B.R. 140, 142–43 (B.A.P. 8th Cir. 2010) (holding that debtors' exclusion of Social Security benefits as source of payment under Chapter 13 plan could not be considered in good-faith analysis), *and Barfknecht*, 378 B.R.

Prior to BAPCPA, courts typically included Social Security benefits in the calculation of disposable income. *See Hagel v. Drummond (In re Hagel)*, 184 B.R. 793, 796 (B.A.P. 9th Cir. 1995); *In re Cornelius*, 195 B.R. 831, 835 (Bankr. N.D.N.Y. 1995); *In re Schnabel*, 153 B.R. 809, 817 (Bankr. N.D. Ill. 1993). *See also Bartelini*, 434 B.R. at 296 (stating that, prior to BAPCPA, courts "consistently included social security income in the calculation of projected disposable income." (internal quotation marks omitted)). This appears to be indicative of a pre-BAPCPA practice to include benefits received under the Social Security Act in the calculation of projected disposable income. If so, we see a "clear indication that Congress intended . . . a departure" from any such pre-BAPCPA practice, *Lanning*, 130 S. Ct. at 2473, in the combined effect of BAPCPA's (1) defining current monthly income to expressly exclude benefits received under the Social Security Act and (2) amending the definition of disposable income to incorporate the definition of current monthly income. And this clear indication by Congress that Social Security benefits are to be treated differently post-BAPCPA must override BAPCPA's purpose of ensuring that debtors "repay creditors the maximum they can afford," *Ransom*, 131 S. Ct. at 725 (internal quotation marks omitted), because any application of that purpose must be "consistent with the statutory text[.]" *Id.*

Were we to follow the approach espoused by the Appellant, bankruptcy courts—contrary to what the Supreme Court contemplated in *Lanning* and contrary to the express statutory language—would be permitted to depart from the definition of disposable income set forth in § 1325(b)(2) in virtually every case, given the improbability of a debtor's actual financial circumstances matching perfectly the disposable-income calculation set out by BAPCPA. *See* 6 Lundin, *supra*, § 500.1 (noting that "[t]he amount of disposable income determined by the formula in § 1325(b)(1) will bear no certain relationship to the debtor's actual financial ability to

_____

at 164 ("[W]hether plan payment must include income derived from Social Security benefits is already specifically addressed elsewhere in the Bankruptcy Code. The trustee's proposed reading of the good faith standard would swallow up these other explicit statutory treatments, effectively rendering them nullities."), *with Bartelini*, 434 B.R. at 297 (holding that a debtor's decision to not commit Social Security benefits to pay unsecured creditors may be "considered as one of many factors under a totality of the circumstances inquiry to determine good faith"), *and Upton*, 363 B.R. at 536 (same). Because the Appellees have chosen to devote Social Security benefits to unsecured creditors, this good-faith issue is not before us today.

make payments"); *cf. Frederickson*, 545 F.3d at 658 ("In enacting BAPCPA, Congress reduced the amount of discretion that bankruptcy courts previously had over the calculation of an above-median debtor's income and expenses. . . . Congress wanted to eliminate what it perceived as widespread abuse of the system by curtailing the bankruptcy courts' discretion . . . . Accordingly, Congress rigidly defined 'disposable income' . . . .").

Turning to the Appellees' mortgage payments, we conclude that § 1325(b) permits the Appellees to deduct their ongoing mortgage payments in accordance with the formula set forth in § 707(b)(2)(A)(iii).  We note that there is a split of authority on the issue of what the phrase "amounts reasonably necessary to be expended" as set forth in § 1325(b)(2) means in the context of secured-debt payments by above-median income debtors.  Section 1325(b)(3) states that, for such debtors, "amounts reasonably necessary to be expended" in § 1325(b)(2) "shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)[.]"  11 U.S.C. § 1325(b)(3).  Thus, a majority of courts have held that above-median-income debtors may deduct ongoing monthly payments on secured debt  in accordance with the formula set forth in § 707(b)(2)(A)(iii) for property that debtors intend as of the date of confirmation to retain, regardless of whether the payments are subjectively reasonably necessary to be expended for the maintenance or support of the debtors or the debtors' dependents.  *See Musselman*, 394 B.R. at 818–19; *In re Davis*, No. 08-13693-SSM, 2008 WL 5786921, at *4 & n.5 (Bankr. E.D. Va. Nov. 18, 2008); *In re Hays*, No. 07-41285, 2008 WL 1924233, at *3–6 (Bankr. D. Kan. Apr. 29, 2008); *In re Moore*, No. 07-11528C-13G, 2008 WL 895668, at *3–4 (Bankr. M.D.N.C. Apr. 2, 2008);  *In re Van Bodegom Smith*, 383 B.R. 441, 445–49 (Bankr. E.D. Wis. 2008); *In re Austin*, 372 B.R. 668, 681 (Bankr. D. Vt. 2007); *In re Edmondson*, 371 B.R. 482, 485–86 (Bankr. D. N.M. 2007); *In re Carlton*, 362 B.R. 402, 411 (Bankr. C.D. Ill.2007); *In re Martin*, 373 B.R. 731, 733–34 (Bankr. D. Utah 2007).[14]  Other courts

---

[14]Some of these courts distinguish between ongoing payments on secured debt and payments to cure arrearages on secured debt, concluding that ongoing payments may be deducted without regard to whether or not they are subjectively reasonably necessary for the maintenance or support of the debtor or the debtor's dependents, while cure payments are deductible only if they are so necessary.  We need not reach this issue here because, according to the Appellees' confirmed Chapter 13 plan, their secured mortgage payment is an ongoing payment only; the Appellees list no amount for payment of an arrearage.

have held that bankruptcy courts have the authority after BAPCPA to continue to engage

in a subjective analysis of what is reasonably necessary, even for above-median-income

debtors. Some courts find this authority to be implicit in *Lanning*. *See In re Collier*, No.

09-33187, 2010 WL 2643542, at \*3 (Bankr. M.D. Ala. June 29, 2010) ("[A] *per se* rule

in which all payments to secured creditors are reasonable necessary deductions under

Section 707(b) is not in keeping with the holding in *Lanning*."). Other courts find the

authority in § 707(b)(2)(A)(iii).[15] *See In re Owsley*, 384 B.R. 739, 748 (Bankr. N.D.

Tex. 2008) ("[T]he court concludes that the limiting language in subclause (II) also

applies to subclause (I).").

Prior to BAPCPA, bankruptcy courts had the discretion to determine whether

debtors' mortgage expenses were reasonably necessary and were permitted to exercise

this discretion for all debtors, regardless of their income. We conclude that § 1325(b)(3)

provides a clear indication that Congress intended a departure from such pre-BAPCPA

practice with respect to above-median-income debtors. Thus, the Appellees should be

permitted to deduct their mortgage payment in accordance with the formula set forth in

§ 707(b)(2)(A)(iii), unless there is some other basis other than the disposable-income test

for disallowing the deduction.[16] Concluding otherwise would limit above-median-

---

[15]This subsection provides as follows:

> **(iii)** The debtor's average monthly payments on account of secured debts shall be
> calculated as the sum of—
>
>    **(I)** the total of all amounts scheduled as contractually due to secured creditors in each
> month of the 60 months following the date of the petition; and
>
>    **(II)** any additional payments to secured creditors necessary for the debtor, in filing a
> plan under chapter 13 of this title, to maintain possession of the debtor's primary
> residence, motor vehicle, or other property *necessary for the support of the debtor and
> the debtor's dependents*, that serves as collateral for secured debts;
>
> divided by 60.

11 U.S.C. § 707(b)(2)(A)(iii) (emphasis added).

[16]There is a split of authority on the issue—which we do not reach—of whether a bankruptcy
court may consider an above-median-income debtor's decision to continue making payments on secured
debt in the good-faith analysis under 11 U.S.C. § 1325(a)(3). *Cf. Davis*, 2008 WL 5786921, at \*4 (holding
that above-median-income debtors' decision to continue making monthly mortgage payment of $5,768 was
evidence of bad faith and denying confirmation in part on that basis), *with Van Bodegom Smith*, 383 B.R.
at 456 (stating in the context of a mortgage payment that "the question of whether the debtors committed
all of their projected disposable income into the plan is a matter solely for review under § 1325(b), and is
not pertinent to engaging in a review of good faith under §1325(a)(3)."), *and Austin*, 372 B.R. at 683

income debtors to deducting the categories of expenses set forth in § 707(b)(2)(A) & (B)—a result that is required but that is different than that for below-median income-debtors[17]—but at the same time would not allow them to take full advantage of the amounts that those subsections would permit them to deduct. We see nothing in § 1325(b)(2) as construed in *Lanning*—nor anything in § 707(b)(2)(A)(iii)—that would support such a result.

In sum, it is appropriate to calculate a debtor's projected disposable income using the inclusions and exclusions from disposable income set forth in the Code and the deductions permitted by the Code, supplemented as of the date of confirmation and adjusted to take into account changes during the applicable commitment period that are known or virtually certain at the time of confirmation. *Cf. Johnson*, 400 B.R. at 651 ("[I]n order to report disposable income projected to be received during the applicable commitment period, a debtor must supplement Official Form 22C with a statement of any changes in the 'current monthly income' as reported in the form, and any changes in the expenses allowed, anticipated to take place during the applicable commitment period.").[18]

---

(holding in the context of an objection to the above-median-income debtors' decision to continue making a payment on secured debt that "post-BAPCPA, [t]he disposable income a debtor decides to commit to his plan is not the measure of his good faith in proposing the plan") internal quotation marks omitted)).

[17] *See Lanning*, 130 S. Ct. at 2470 ("If a debtor's income is below the median for his or her State, 'amounts reasonably necessary' include the full amount needed for 'maintenance or support,' see § 1325(b)(2)(A)(i), but if the debtor's income exceeds the state median, only certain specified expenses are included, see §§ 707(b)(2), 1325(b)(3)(A)." (footnote omitted)).

[18] The Appellant makes three additional arguments in support of her position that the Appellees had positive projected disposable income as of the date of confirmation. First, she contends that the Appellees' projected repayment of a retirement loan during the term of the plan must be taken into account in the calculation of their projected disposable income. The issue of whether disposable income includes amounts that become available as a result of a debtor repaying a retirement-plan loan is on appeal from the Bankruptcy Appellate Panel for the Sixth Circuit. *See Burden v. Seafort (In re Seafort)*, 437 B.R. 204 (B.A.P. 6th Cir. 2010), *appeal docketed*, No. 10-6248 (6th Cir. Dec. 1, 2010). Second, the Appellant argues that the Appellees may not deduct certain standardized deductions allowed by § 1325(b)(3) and § 707(b)(2)(A) and (B) if they did not actually incur the expenses. We need not address either of these issues because the exclusion of Social Security benefits from disposable income and the deduction of the mortgage payment together mean that the Appellees had negative projected disposable income as of the confirmation date. The Appellant also contends that the Appellees must include in the calculation of projected disposable income any income from employment that is known or virtually certain as of the date of confirmation even if they did not have that income during the six-month period reflected on Form 22C. Under *Lanning* and *Darrohn*, such income must be included in the calculation of projected disposable income so long as the income does not fall within the categories of income excluded from disposable income by the Code. *See Darrohn*, 615 F.3d at 476.

**C.      The Temporal Requirement of the Applicable Commitment Period Applies to Debtors with Zero or Negative Projected Disposable Income as of the Date of Confirmation.**

This brings us to the issue of whether there is an exception to the temporal requirement set forth in § 1325(b) for debtors with zero or negative projected disposable income. The Eleventh Circuit and certain bankruptcy courts have held that the applicable commitment period applies to debtors with zero or negative projected disposable income. *See, e.g.*, *Tennyson*, 611 F.3d at 876–77; *Moose*, 419 B.R. at 635; *Meadows*, 410 B.R. at 245–46; *Brown*, 396 B.R. at 554–55; *Nance*, 371 B.R. at 371–72; *Casey*, 356 B.R. at 527–28. *See also Kagenveama*, 541 F.3d at 879 (Bea, J., concurring in part and dissenting in part) (concluding that the applicable commitment period applies whether or not the debtor has positive projected disposable income). By contrast, the Ninth Circuit and several other courts, including the district court below, have held that the applicable commitment period does not apply to debtors with zero or negative projected disposable income. *See, e.g.*, *Kagenveama*, 541 F.3d at 875–77; *Baud*, 415 B.R. at 293; *Musselman*, 394 B.R. at 813–14; *Green*, 378 B.R. at 38; *Lawson*, 361 B.R. at 220; *Alexander*, 344 B.R. at 751. *See also In re Davis*, 392 B.R. 132, 146 (Bankr. E.D. Pa. 2008) (assuming for the sake of argument that the applicable commitment period imposes a temporal requirement and holding that, if so, it does not apply to debtors with zero or negative projected disposable income). In holding that there is no exception to the applicable-commitment-period requirement for debtors with zero or negative projected disposable income, the Eleventh Circuit applied a plain-meaning analysis, pointing out that § 1325(b)(4) "does not state that the 'applicable commitment period' exists solely for the § 1325(b)(1)(B) calculation and it certainly does not state that the 'applicable commitment period' becomes inconsequential if disposable income is negative." *Tennyson*, 611 F.3d at 877. The Eleventh Circuit also noted that the applicable commitment period "shall be" three years or five years and that the length of the period to be applied to a particular debtor is based solely on "the current monthly income of the debtor and the debtor's spouse combined," 11 U.S.C. § 1325(b)(4), not on the debtor's having positive projected disposable income. *See Tennyson*, 611 F.3d at 877. By contrast, the Ninth Circuit—also applying a plain-meaning analysis—held that

there is an exception to the applicable-commitment-period requirement for debtors with zero or negative projected disposable income.  In so doing, the Ninth Circuit agreed that the applicable commitment period imposes a period of time over which projected disposable income is to be paid, but concluded that, if the debtor's projected disposable income is zero or negative, the applicable commitment period is "irrelevant." *Kagenveama*, 541 F.3d at 877.

In addressing this difficult issue, we begin once again with the language of the statute itself.  Under § 1325(b), a plan that does not propose to pay the holders of unsecured claims in full may not be confirmed over objection unless it "provides that all of the debtor's *projected disposable income* to be received in the *applicable commitment period* . . . will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)(B) (emphasis added).  Under the express language of § 1325(b)(4), the applicable commitment period does not depend on the amount of the debtor's projected disposable income.  To the contrary, the applicable commitment period depends on the current monthly income of the debtor and the debtor's spouse combined. *See* 11 U.S.C. § 1325(b)(4); *Tennyson*, 611 F.3d at 877; *Nance*, 371 B.R. at 371 ("The definition of 'applicable commitment period' . . . is linked exclusively to the amount of a debtor's current monthly income.").  Section 1325(b)(4) expressly states that the applicable commitment period shall be three years, unless the debtor's current monthly income is above the applicable state median, in which case it shall be not less than five years. *See* 11 U.S.C. § 1325(b)(4)(A).  Confirmation of a plan of less than three or five years in length, respectively, is permissible "only if the plan provides for payment in full of all allowed unsecured claims over a shorter period."  11 U.S.C. § 1325(b)(4)(B).  Accordingly, the express statutory language strongly suggests that, upon the filing of an objection to confirmation of a plan that does not propose to pay unsecured claims in full, in order for the plan to be confirmed under § 1325(b)(1)(B), it must provide that all of the debtor's projected disposable income will be applied to make payments over a duration equal to the applicable commitment period and that this is the case whether the debtor has negative, zero or positive projected disposable income. *See Tennyson*, 611 F.3d at 877–78 ("[Section 1325(b)(4)] certainly does not state that the 'applicable

commitment period' becomes inconsequential if disposable income is negative." (citing *Atl. Sounding Co. v. Townsend*, 129 S. Ct. 2561, 2575 (2009) ("[W]e will not attribute words to Congress that it has not written.")). Accordingly, we conclude that the better reading of § 1325(b) is that the temporal requirement of the applicable commitment period applies to debtors facing a confirmation objection even if they have zero or negative projected disposable income.

This, however, does not end our inquiry. Although we find the interpretation of § 1325(b) that applies the applicable commitment period to debtors with zero or negative projected disposable income to be more persuasive than the competing interpretation, we also recognize that the plain-language arguments supporting each approach are nearly in equipoise, and that the circuit-level decisions on the issue are entirely so. For assistance in interpreting the statute, therefore, we turn once again to the guideposts provided by the Supreme Court in *Lanning* and *Ransom*.

In rejecting the mechanical approach to calculating projected disposable income, the Supreme Court in *Lanning* relied primarily on the lack of explicit multiplier language in § 1325(b) and on the state of pre-BAPCPA practice. *See Lanning*, 130 S. Ct. at 2478 ("Consistent with the text of § 1325 and pre-BAPCPA practice, we hold that when a bankruptcy court calculates a debtor's projected disposable income, the court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation."). But these guideposts do not aid us here. Although, as discussed earlier, the lack of explicit multiplier language in § 1325(b)(1)(B) leads us to an interpretation of § 1325(b) under which a Chapter 13 plan that does not provide for full payment of creditors and that is subject to an objection must provide that all of the debtor's projected disposable income will be applied to make payments for the duration of the applicable commitment period, the lack of explicit multiplier language does not answer the question of what the plan must provide if the debtor has no positive projected disposable income with which to make payments. And pre-BAPCPA practice sheds no light here because "[t]o veterans of Chapter 13 practice, it runs afoul of basic principles to suggest that a debtor with no disposable income can nonetheless propose

a confirmable plan[,] [y]et BAPCPA permits precisely that." *Alexander*, 344 B.R. at 750.[19] Thus, we turn next to the third guidepost set forth in *Lanning*. In rejecting the mechanical approach to calculating disposable income, the Supreme Court—in addition to primarily relying on the lack of explicit multiplier language in § 1325(b) and on the state of pre-BAPCPA practice—also noted that its holding would avoid "senseless results":

> In cases in which a debtor's disposable income during the 6-month look-back period is either substantially lower or higher than the debtor's disposable income during the plan period, the mechanical approach would produce senseless results that we do not think Congress intended. In cases in which the debtor's disposable income is higher during the plan period, the mechanical approach would deny creditors payments that the debtor could easily make. And where, as in the present case, the debtor's disposable income during the plan period is substantially lower, the mechanical approach would deny the protection of Chapter 13 to debtors who meet the chapter's main eligibility requirements.

*Lanning*, 130 S. Ct. at 2475–76. As we previously discussed, in response to an argument made by the debtor in *Ransom* that the Ninth Circuit decision from which he was appealing would lead to senseless results, the Supreme Court made clear that any analysis predicated on purported senseless results must be cabined by still another guidepost—BAPCPA's purpose of ensuring that debtors repay creditors using their full disposable income. *See Ransom*, 131 S. Ct. at 729 ("Ransom finally contends that his view of the means test is necessary to avoid senseless results not intended by Congress. At the outset, we note that the policy concerns Ransom emphasizes pale beside one his reading creates: His interpretation, as we have explained, would frustrate BAPCPA's core purpose of ensuring that debtors devote their full disposable income to repaying

---

[19]Under BAPCPA, a debtor with zero or negative projected disposable income may propose a confirmable plan by making available income that falls outside of the definition of disposable income—such as the Appellees' benefits under the Social Security Act—to make payments under the plan to administrative, priority and secured creditors and to make any payments to unsecured creditors required to satisfy other confirmation requirements. Other confirmation requirements would include the best-interests test set forth in § 1325(a)(4). *See* 11 U.S.C. § 1325(a)(4) (providing that, in order for a Chapter 13 plan to be confirmable, "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date").

creditors. ).[20]  The Supreme Court's approach in *Ransom* is consistent with *Lanning*, in which the Supreme Court noted that its holding would avoid the "senseless result[] that we do not think Congress intended" of "deny[ing] creditors payments that the debtor could easily make." *Lanning*, 130 S. Ct. at 2475–76.

Courts that have applied the applicable commitment period to debtors with zero or negative projected disposable income have concluded without extended analysis that this approach would best serve BAPCPA's goal of ensuring that debtors repay creditors the maximum amount they can afford.  See, e.g., *Tennyson*, 611 F.3d at 879 ("[A]llowing Tennyson to confirm a plan for less than five years would deprive the unsecured creditors of their full opportunity to recover on their claims from Tennyson by way of post confirmation plan modifications."); *Moose*, 419 B.R. at 635 ("[A]llowing above-median income debtors to exit chapter 13 in less than five years deprives the trustee and creditors of the right to seek an increase in plan payments if the debtors' financial situation were to improve dramatically during that period.").  We agree with the conclusion those courts have reached, but find that adequately explaining it requires a more extended analysis, including a brief discussion of post-confirmation modification of Chapter 13 plans.  Section 1329(a) provides that "[a]t any time after confirmation of the plan *but before the completion of payments under such plan*, the plan may be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim[.]" 11 U.S.C. § 1329(a) (emphasis added).[21]  A few courts have held that the

---

[20]In reaching this conclusion, the Supreme Court consulted the legislative history to BAPCPA. *See id.*  We believe that it also is appropriate to consult legislative history in this case because where, as here, a "textual analysis fails to produce a conclusive result, or where it leads to ambiguous or [arguably] unreasonable results, a court may look to legislative history to interpret a statute." *Limited, Inc. v. C.I.R.*, 286 F.3d 324, 332 (6th Cir. 2002).  A portion of the legislative history that was not relevant in *Ransom* but that is relevant here supports the view that there is no exception to the applicable commitment period for debtors with zero or negative projected disposable income.  *See* H.R. Rep. 109-31(I), p. 79, 2005 U.S.C.C.A.N. 88, 146 ("Paragraph (1) of section 318 of the Act amends Bankruptcy Code sections 1322(d) and 1325(b) to specify that a chapter 13 plan may not provide for payments over a period that is not less than five years if the current monthly income of the debtor and the debtor's spouse combined exceeds certain monetary thresholds.").  As this legislative history suggests, BAPCPA requires certain debtors to make payments over a "period that is not less than fives years"—a clearly temporal requirement—and the determination of which debtors must do so is based solely on "the current monthly income of the debtor and the debtor's spouse combined," not on whether the debtor has positive projected disposable income.

[21]Presumably designed in part to assist creditors and the Chapter 13 trustee in deciding whether to bring motions to modify, § 521(f)(4)(B), which was added by BAPCPA, requires Chapter 13 debtors (at the request of the Court, the United States Trustee or any party in interest) to provide annual statements

phrase "completion of payments" has a temporal connotation and that payments are not completed until the time period in which the payments are to be made has passed. *See Fridley*, 380 B.R. at 546 ("[T]he statutory concept of 'completion' of payments includes the completion of the requisite period of time."); *Buck*, 2010 WL 5463063, at *6 ("Even where, as in the case of these Debtors, no funds are available on a monthly basis for payment to the Trustee, Debtors could propose a modified plan with monthly payments of zero dollars to the Trustee. If neither the Trustee nor a creditor propose a further modification to the Plan during the remaining portion of the [applicable commitment period], Debtors will have completed their payments under the Plan and will be eligible for a Chapter 13 discharge at the conclusion of their original [applicable commitment period], assuming all other requirements for discharge set out in § 1328 have been met."); *In re McKinney*, 191 B.R. 866, 869 (Bankr. D. Or. 1996) (holding that completion of payments under a plan occurs only when the debtor has fulfilled the temporal requirement of § 1325(b)(1)). *See also* 3 Lundin, *supra*, § 253.1 ("Completion of payments under a Chapter 13 plan could be measured in terms of the passage of time—for example, if the confirmed plan required the debtor to make payments for 36 months, when 36 months pass, the debtor has completed the payments required by the plan."). Other courts, however, have held that the completion of payments under the plan does not require the passage of the period of time contemplated in the plan or that the debtor make the number of payments contemplated by the plan; rather, completion generally is held to have occurred once the debtor has tendered the monetary amount required by the plan to the Chapter 13 trustee or, at the latest, once creditors receive, either directly from the debtor or through the trustee, the recovery on their claims called for by the plan. *See In re Jacobs*, 263 B.R. 39, 44 (Bankr. N.D.N.Y. 2001) ("[T]hose courts addressing the completion of payments issue have generally . . . held that a plan is complete when the debtor makes all the payments to the trustee." (internal quotation

---

(after the case is confirmed and until it is closed) of their income and expenditures. *See* 11 U.S.C. § 521(f)(4); *Fridley*, 380 B.R. at 544 ("The obvious purpose of this self-reporting obligation is to provide information needed by a trustee or holder of an allowed unsecured claim in order to decide whether to propose hostile § 1329 plan modifications."); *Nance*, 371 B.R. at 371 ("The purpose of [§ 521(f)], ostensibly, is to allow interested parties to monitor a debtor's financial situation during the pendency of the bankruptcy case and to seek modification of the plan pursuant to § 1329 if changes in that situation occur.").

marks omitted)); 3 Lundin, *supra*, § 253.1 & n.28 (collecting cases holding that payments under the plan are completed once the debtor has tendered the amount required to pay creditors as provided for in the plan).

The question of whether applying the applicable commitment period to debtors with zero or negative projected disposable income would produce senseless results ultimately turns on an issue—the meaning of "completion of payments" as used in § 1329(a)—that is not before us. That is, whether applying the applicable commitment period to debtors with zero or negative projected disposable income would result in potentially greater recoveries for creditors or instead would only lead down the path to potentially absurd results for debtors without any benefit to creditors turns on which interpretation of "completion of payments" this Court or, ultimately, the Supreme Court, were to adopt if presented with the issue. As explained below, if this Court or the Supreme Court were ever to hold that completion has a temporal connotation, then an interpretation of § 1325(b) that applies the applicable commitment period to debtors with zero or negative projected disposable income could result in greater recoveries for creditors and would not necessarily lead to absurd or senseless results; conversely, if this Court or the Supreme Court were ever to hold that completion does not have a temporal connotation, then an interpretation of § 1325(b) that applies the applicable commitment period to debtors with zero or negative projected disposable income would not result in greater recoveries for creditors and could lead to absurd or senseless results.

To see why this is so, assume that a Chapter 13 trustee or an unsecured claimant objects to the confirmation of a hypothetical debtor's plan, but that the bankruptcy court declines to apply the applicable commitment period on the basis that the debtor has zero or negative projected disposable income. The debtor proposes, and the court confirms, a plan providing for payments to be made in less than what would have been the applicable commitment period had it been applied. The debtor has sources of income that do not constitute projected disposable income. It also turns out that the debtor needs less than the time period that would have been the applicable commitment period had it been applied to make payments to administrative, priority and secured claimants and

to make any payments the debtor must make to unsecured creditors in order to comply with confirmation requirements such as the best-interests test. Assume that the debtor needs nine months and proposes a plan of that length. Because the applicable commitment period was not applied at confirmation, completion of payments under the plan within the meaning of § 1329(a) will have occurred as soon as the nine-month period passes and the last payment under the plan is made. And, because a party in interest may request a plan modification only before the completion of payments under the plan, the trustee and unsecured creditors would have no opportunity to seek a modification of the plan. Creditors effectively would be barred from maximizing their recoveries by obtaining a distribution on their claims from disposable income that may become available after the completion of payments but before the end of what would have been the applicable commitment period if it had been applied.

On the other hand, if the bankruptcy court had applied the applicable commitment period at the time of confirmation and the view that completion of payments is temporal were followed, then completion of payments under the plan would have occurred only after the applicable commitment period had passed; by applying the applicable commitment period to debtors with zero or negative projected disposable income, creditors would have a longer period of time in which to realize a greater recovery on their claims. Again, however, if completion were interpreted as not having a temporal connotation, any opportunity to augment creditor recoveries with additional disposable income that becomes available post-confirmation would be illusory in cases where payments required under the plan already have been made. In sum, whether applying the applicable commitment period to debtors with zero or negative projected disposable income would result in potentially greater recoveries for creditors depends ultimately on the meaning of the phrase "completion of payments" contained in § 1329(a).

Whether applying the applicable commitment period to debtors with zero or negative projected disposable income could lead to senseless or absurd results also turns

in large part on the meaning of the same phrase.[22] The concern has been expressed that applying the applicable commitment period to such debtors would be senseless because it would essentially trap them in bankruptcy even after unsecured creditors would no longer have an opportunity to recover any disposable income that would happen to become available. Under the majority view of the meaning of the phrase "completion of payments," any opportunity to capture additional disposable income by attempting to modify the plan would be impossible where payments under the plan already have been made. And requiring debtors who already have completed payments to remain in Chapter 13 beyond the time that it takes them to cure arrearages (*see* § 1322(b)(5)) and pay secured, priority and administrative claims arguably serves no purpose if they have no positive disposable income available to pay unsecured creditors. It also would not benefit creditors if those creditors lack the means to recover any disposable income that becomes available because payments under the plan already have been completed. On the other hand, under the temporal view of the phrase "completion of payments" adopted by some courts, payments would not be considered completed until the end of the applicable commitment period and the trustee and creditors could request a modification to recover future disposable income.

The meaning of "completion of payments" under § 1329(a) is an interesting question that is not before us and therefore must await another day. We cannot predict how this Court would resolve the issue if it came before us. We are certain, however, that there is nothing we can glean from the legislative history to BAPCPA that would suggest that Congress was focused on this issue or on the potential problems posed by "trapping" debtors in Chapter 13 for the full applicable commitment period. To the

---

[22]Some courts have pointed out that applying the applicable commitment period to debtors with zero or negative projected disposable income will result in a portion of such debtors remaining in their Chapter 13 plans for several years even when they have no income—and never will—to pay unsecured creditors. *See Meadows*, 410 B.R. at 246 (while adopting the temporal approach, noting that "[o]ne criticism of requiring an 'applicable commitment period' in cases where there is no projected disposable income is that it can require sixty-month plans in cases where there is little, if any, prospect of future increases in projected disposable income."). So long as the possibility remains that changes could occur in the debtor's circumstances and that such changes could result in disposable income becoming available before the end of the applicable commitment period—and it would be rare cases in which there would be no such possibility—keeping the debtor in Chapter 13 could conceivably result in some benefit to creditors, a result that is not senseless.

contrary, as the Supreme Court recognized in both *Ransom* and *Lanning*, the legislative history makes clear that the focus of Congress in enacting BAPCPA was on maximizing the amount of disposable income that debtors would pay to creditors. And there are numerous circumstances in which disposable income might become available to the Appellees and to other debtors after confirmation, even those who have zero or negative projected disposable income as of confirmation. Just by way of example: income that is properly included in the calculation of disposable income could increase after confirmation; taxes might decrease, as might other items included as "Other Necessary Expenses;" and secured debt payments (especially on vehicles) and payments on account of qualified retirement deductions may come to an end during the plan, as will be the case for the Appellees. *See Kagenveama*, 541 F.3d at 880 (Bea, J., concurring in part and dissenting in part) ("There are many imaginable instances where a debtor's financial situation will dramatically improve after plan confirmation—either through good fortune or clever planning.").

We believe it is now clear that, where each competing interpretation of a Code provision amended by BAPCPA is consistent with the plain language of the statute, we must, as the Supreme Court did in *Lanning* and *Ransom*, apply the interpretation that has the best chance of fulfilling BAPCPA's purpose of maximizing creditor recoveries. Here, that interpretation is the one under which the applicable commitment period applies to all debtors facing a plan objection, even those who have zero or negative projected disposable income. Although this interpretation may not benefit creditors in all cases to a greater extent than the competing interpretation, although it may in certain circumstances lead to unfortunate situations in which some debtors will remain in Chapter 13 for no good reason, and although our interpretation could be undermined by a subsequent controlling interpretation of § 1329(a), this does not appear to us to be a situation where our interpretation of the statute "would lead to patently absurd consequences, that Congress could not *possibly* have intended[.]" *Pub. Citizen v. United States Dep't of Justice*, 491 U.S. 440 (1989) (Kennedy, J., concurring) (citation and internal quotation marks omitted). On balance, we conclude that applying the applicable commitment period to debtors with zero or negative projected disposable income would

best serve BAPCPA's goal of ensuring that debtors repay creditors the maximum amount they can afford.

In sum, we adopt the interpretation of § 1325(b) that is not only more consistent with the language of the statute than the competing interpretation, but that also is consistent with the legislative history and the overriding purpose of BAPCPA as recognized in *Lanning* and *Ransom*.

## III. CONCLUSION

To summarize, we hold: (1) if the trustee or the holder of an allowed unsecured claim objects to confirmation of a Chapter 13 plan of a debtor with positive projected disposable income, the plan cannot be confirmed unless it provides that all of the debtor's projected disposable income to be received in the applicable commitment period will be applied to make payments over a duration equal to the applicable commitment period set forth in § 1325(b); (2) the calculation of a debtor's projected disposable income (a) must exclude income—such as benefits received under the Social Security Act—that are excluded from the definition of currently monthly income set forth in § 101(10A) and (b) must deduct "amounts reasonably necessary to be expended" as defined in § 1325(b)(3) which, for an above-median-income debtor, means that the debtor's average monthly payments on account of secured debts calculated pursuant to § 707(b)(2)(A)(iii) must be subtracted if the debtor intends as of the date of confirmation to continue making those payments; and (3) there is no exception to the temporal requirement set forth in § 1325(b)(1) for debtors with zero or negative projected disposable income. For the reasons stated above, we **AFFIRM** in part and **REVERSE** in part the district court's opinion and order, and **REMAND** the case to the district court with instructions to remand to the bankruptcy court for further proceedings consistent with this opinion.